Second case on the docket is Reimer v. Smith. We have Mr. Austin and Mr. Barnhart, is that correct? That's correct, Your Honor. 09-295, Mr. Austin. Go ahead. Thank you, Your Honor. Please report, counsel. This is a relatively straightforward location in terms of the facts. At the center of the controversy is an oil and gas lease called the Ging lease. The property covered by the Ging lease was developed with production of oil back in 1941. And oil marketed from that property was marketed under the name Ging No. 1. Now, during all periods of time relevant to this case, the crude oil was purchased first by Countrymark, one of the defendants, until February of 03, and then later by the defendant, by Petro. The defendant, Smith, is an independent oil producer, and she acquired the operating rights for the Ging lease in 1975. She also acquired, incidental to that, the working interest in the lease. In addition to her interest in the lease, there were a host of underlying mineral owners, sometimes called royalty owners, who had an interest in this property. The plaintiff, Reimer, is a consulting geologist, and he also has a production company. Reimer observed Smith's operations of the Ging lease, or we would say non-operations in this case, and then began acquiring top leases. Once he had acquired a number of top leases, he brought an action in Clay County for declaratory judgment to have the Ging lease declared forfeited due to non-production. The Ging lease provided by its terms that it would continue in effect beyond the primary term as long as oil and cinder was produced from the lease premises. Now at trial, Smith's production history was proven as follows. No oil was produced in 1996. Less than one tank was sold in 1997. No oil was sold in 1998. No oil was sold in 1999. No oil was sold in 2000 until September of that year. Between December 1995 and September 2000, Smith's average monthly production was only slightly greater than three barrels of oil per month. Her own testimony at trial was that the lease should have been capable of producing nine barrels a day, so she produced approximately 190th of what the well was conceivably capable of producing. There was a modest amount of production during the balance of 2000 and in 2001, and then the production fell off again in 2002 and 2003, in which years only one tank was produced in each of those two years. So based on this evidence, we don't think the trial court had a great deal of difficulty in reaching a judgment in Reimer's favor in 2006 when it held that Smith forfeited the game lease by reason of non-production. That was in 2006. Fast forward two years. More procedural history. The 2006 judgment was a final and appealable order, but nobody took an appeal from that. During the period of time, BiPetro and Countrymark held funds in suspense from the proceeds of the sale of the oil that were not distributed. The court in the 2006 judgment did not direct the disposition of the funds. In 2008, Smith filed a motion in the Senate proceeding to an order of distribution of the funds in suspense. Reimer responded with his own motion opposing Smith's motion seeking an order for the distribution of funds, but his motion had a somewhat different twist. Reimer sought a ruling as to the effective date of the termination of the lease. Reimer asked that the distribution be made to the parties as their interests appear of record. Smith, on the other hand, in her motion, asked that the distribution be made to her. The parties in the subsequent proceedings stipulated to the continuing jurisdiction of the trial court. The trial court then entered an order in early 2009 to the effect that the effective date of the termination of the lease was the date of the judgment, namely October 2006. So what's the point? The significance of a specific binding as to the effective date of the lease termination is that the crude oil purchasers are going to rely upon that date to determine who to distribute the funds in suspense to. Now, whether or not the lease was producing is a question of fact for the trial court to determine. The trial court made that determination in favor of the plaintiff in 2006. The court erred, however, when it entered an order in 2009 stating that the effective date of the lease termination was the date of the judgment. The later order was inconsistent with the 2006 judgment as well as with established law. And I'll explain it. The court determined in 2006 that the game lease was annulled. The court found that the game lease was terminated by its own terms as a result of the non-production. The 2006 judgment states in part as follows, that any production by Smith subsequent to a lack of production would not reinstate the lease. It is therefore the determination of this court that the game lease has terminated by its own terms based upon a lack of or cessation of production in commercial quantity. Now, remember from the production history, Smith attempted a brief resumption of production in the latter part of 2000 and in 2001. But the trial court held that any production by Smith subsequent to a lack of production would not reinstate the lease. The point is that the state of facts that led the court to declare the game lease terminated actually existed several years prior to the 2006 judgment. Accordingly, the court's 2009 order is inconsistent with that judgment because the lease expired by its own terms, not by the entry of the judgment. The judgment itself did not serve to terminate the lease. Rather, the judgment was a judicial recognition or declaration of the existence of some state of facts that in and of themselves brought about the termination. And that state of facts occurred some years prior to the entry of that 2006 judgment. Any other interpretation of when the lease terminated would render the language of the trial court's own judgment meaningless. What is the date you believe it terminated? We believe that the production history indicates that a date at least as early as July 1, 1999, would be the appropriate date of termination. Did you request that the trial judge put that in its original order? Yes, Your Honor. And he obviously did. Yes, Your Honor. We wouldn't be here. So it's our position there would be no reason to refer in the judgment to the reinstatement of something that was still in existence. There would be nothing to reinstate if the lease was in good standing. So the trial court's 2006 judgment is consistent with applicable law, but the 2009 order is not. What was the date that the oil was held? I think it's called held in suspension or whatever. Put aside, I guess. When did that start? The proceeds were held in suspense, I believe, going back as early as the 1990s. As long as this case has been in controversy, no funds have been distributed. I hesitate to say exactly because I'm just not sure. But there is money held in suspension. And the records show shortly after the lawsuit was filed? I would say yes. I know we filed a list-pendant notice as soon as the lawsuit was filed in 2003. There was actually an earlier suit in about two years prior to that in 2001 How much money are you talking about? I'm not sure. It's a record in these proceedings. But I believe it is in the teens, $14,000, $15,000. There are no cases that are precisely on point of this issue. We cited just a handful of cases. We cited the Illinois Supreme Court of Gillespie v. Wagner in our brief. Gillespie, I believe, is probably the leading case dealing with this particular subject matter. The plaintiff in Gillespie was a landowner seeking a declaration that the lease in question was terminated due to non-production. And the Gillespie court pronounced that once a lease is terminated, it cannot be revived by commencing production. In the Gillespie case, the defendant tried to resume production simultaneously with the filing of the suit. Gillespie held the lease terminated by esteem terms prior to that, not only prior to the time the suit was filed, but certainly prior to the time the judgment was held. Belden v. Tristar in this district case stands for much the same proposition. The difference with Belden is that Belden happens to also be an oil and gas operator in Fayette County. Belden obtained top leases like Reimer, then filed an action for declaratory judgment to have the earlier lease, the base lease, found invalid due to lack of production. This court found in favor of Belden. Again, there was an attempt to resume production in the Belden case. The court said no, the base lease terminated due to the inactivity. The inactivity obviously took place well before the case was ever decided. Both cases make it abundantly clear that the judicial declaration of the rights of the parties is not the event that brings about the lease termination. Are there any cases, I mean obviously the inactivity would have had to occur prior to you all filing the lawsuit. Absolutely. Are there any cases that would allow you to make a claim for the oil or the money prior to filing the lawsuit, but what your proof showed was the actual date of the ceasing production? Well, that's an interesting point, Your Honor, because, and I'm speaking to the appellee's brief in this case, and contrary to the position of the appellee, Reimer never made a claim to those money. Reimer asked for a declaration of when the lease terminated. He said then leave it up to the oil companies to distribute based upon that information. Reimer never said this is his money. Smith said it's her money and she wants it. There's a difference. So hopefully I answered your question. All right, one perspective, money or oil from it, not any prior to the filing of the lawsuit. That's correct. I believe that covers the points and concludes my argument. Are there any other questions? Thank you, Counsel. Thank you. Mr. Barnhart. This case is one of those cases that can be overly complicated or very simple. I was not trial counsel. I was pulled in by David Williams in post-trial proceedings, and he is now a state's attorney in Wayne County, so I'm left finishing this matter out for Mrs. Smith. I'm unsure where to start, Justices, on presenting my argument. That's because this matter is a bit convoluted, so to speak. The appeal asks that you deem a lease terminated July 1, 1999. He's asking you to reach back and do this through the trial court, through a judge, and heard all this evidence. As Mr. Austin was closing out, he mentioned that there is no difference, really, as to what's going on, on naming these termination dates or deeming a lease invalid or having an owner of record, so to speak. But I'll also point out some factual basis here that shows that there is a huge difference as to what this court does today. And Mr. Austin is right. There is no case law that goes straight into these matters. That's one of the exciting things about, if there is an exciting thing about federal law. We get to find little nuances and come in and try to argue the in-betweens of the rules. Mr. Reimer is correct in that Tri-Star and Belden and the Gillespie cases are the leading cases when it comes to terminating a lease or deeming a lease terminated. That is not what's at issue. The evidence is clear, and the appeal was essentially waived, that Mrs. Smith did not produce enough to keep a lease going or even revive a lease. That's not what's being argued, actually, for the court in what was argued. And it's most recently in trial court. What was being argued in trial court was the determination, the key date here is the determination of when it was found the lease was invalid or not able to be produced. Because of non-production. Because of non-production. And wouldn't the non-production have to have begun prior to filing the lawsuit? It did, Judge. And the key here is what property rights are best with whom when this lawsuit is started. If you follow the track of Mr. Reimer's arguments, they would have said there was no ownership between 1999 and the recording of the last lease that would give Mr. Reimer that 50%. We cited a statute in our brief that kind of says, okay, you have a lease when? And that is when you have at least one half the world. In this case, Mr. Reimer did not have a lease until the court decided that Mrs. Smith's lease was terminated or defended. And as the plaintiff or the appellant points out in his brief, that's a question of fact. That is clearly a question of fact for the trial court. That's cited in both briefs, I believe. That's undisputed. So the question becomes, what do you do in this interim if there's attempts to produce, there hasn't been a judicial determination, and it hasn't been enough to keep the lease going? That's kind of where we're following this gap in case law. We're asking the court to look at several different areas. One was equity. We presented that issue to the trial court. Another is an issue of property rights. As we have pointed out from the appellee standpoint, Mr. Reimer's property rights do not vest until he has granted a valid lease. We also pointed out a case that I'd like to cite to the court that's in our brief. And that is Ohio Oil Company v. Daugherty, 240 Illinois 361, 1909 case. Again, there's not much out there we can rely on. A lease just gives you, according to this case, a right to explore and produce. It does not give you what has happened before. And that's what Mr. Reimer is trying to do through the trial court, is reach back as to what's happened before. The record is very clear in Judge Todd's order. Judge Todd Tolbert, the order of October 19, 2006, and his follow-up order that we'll hear on today, it's very clear that Mr. Reimer did not use any of his assets or any of his efforts to produce this when he's being held in suspense. The way it's being held in suspense is a reduction from about the 2001-2002 time frame prior to the lawsuit being filed. Mr. Reimer had no standing in 2001 or 2002 to claim that reduction. Because, number one, his last lease was presumably signed in February of 2003, right before they started this action. Now, I want to distinguish Gillespie a little bit and the other case in TriStar versus Bell a little bit, or at least Gillespie. Gillespie is a case about a lessor, a royalty owner, objecting to the continuation of the lease. What we have here are basically a top lessee and a prior lessee arguing over who is leasing the property. There's a little bit of distinction as to how this court should view this. A royalty owner, in our case, has been paid. The royalty owners have been paid based on this reduction. The question is who gets the working interest money that's being held. And we posit, from our standpoint, that that should go to Mrs. Smith. Because until Mr. Reimer had a valid lease, all that working interest was still essentially being held by Mrs. Smith, or no one at all. That's why we brought the equity claims to the trial court to argue this post-verdict issue. Mrs. Reimer basically won a Merowick claim, is what we presented. She put all the effort out. It was her equipment to produce. Therefore, she should be allowed to proceed. I also want to point out one thing. Again, when was this, when was the plaintiff acquired the lease? The last lease, I believe, was acquired according to my brief on page 2. The first one was executed March 11, 2002, and the last one was executed February 23, 2003. The lawsuit was filed March 17, 2003. So we're operating with the assumption that that last lease gave him that 50% that he needed to go forward to have the prior lease released, so he could then begin production. Do you think that the plaintiff would be entitled to any of the money held by Mrs. Pence from the day the lawsuit on? Judge, I was trying to figure out a way to equate that in my brain as I was preparing for hearing her argument today. And I would say no, because there was still a question, in fact, whether the minimum production by Mrs. Smith during that time was insufficient enough to deem that lease valid. Again, there was a question, in fact, still pending through this whole matter as to whether her efforts to reinstate the lease, revive the lease, were enough. Until the judge dropped the gavel or signed the order, we're saying that that question, in fact, was still out there and that Mr. Reimer did not have a vested interest until October 19, 2006 when Judge Todd issued his order. Again, I think it's very important to also point out that Mr. Reimer did nothing other than file a lawsuit. I wanted to point something out. But he said he filed a suspense notice, too. At the same time the lawsuit was filed. But he didn't move to enjoin. And the suspense that's being held up is from 2001-2002. Is it a common practice in this type of industry for all producers to, once there's a list pending, to keep the proceeds segregated? Yes, Judge, but there has been no production since that list pending has been filed. But the money being held in suspense is from the 2001-2002 timeframe, from what I understand. I want to point out some language in Judge Todd's October 2006 order or verdict. On the last page, page 5, he says, This is unless you still have the right at any time to remove all machinery and fixtures placed on the premises, including the right to draw and remove casing. This right of removal by law may be determined to be limited by a reasonable amount of time. This court specifically finds that a reasonable amount of time has not yet passed. But even as of October 2006, Judge Todd is saying, we still have a property interest here. You still have a right to that property interest. That particular quote goes to the equipment and casings that are still on the ground. That gives an indication of what Judge Todd's theory was, is that up until I find that you have not produced enough to keep that lease going, all this property is still yours. Which, in our opinion, includes the production of 2001-2002. I had the benefit of sitting here during the last arguments involving the Home Repair and Modeling Act. And Your Honor mentioned the unscrupulous owner theory. An unscrupulous owner in that case would sit back and just wait until the repairs are done and then say, I'm not going to pay you because you didn't give me a brochure. That analogy could also be used in this case. An unscrupulous top lessee, so to speak, could sit there and let Mrs. Smith expend all her resources and get that lease pumping full blast to where it's producing the maximum capacity. And then go in and say, after a few years even, guess what, I've had this lease this entire time. Now all that money you've earned, you have to give to me because you didn't have a valid lease four years ago, five years ago, two years ago. So we'd ask the court to also consider that issue. If the court rules in Mr. Reimer's favor, it's promoting this idea of, let's wait and see what happens. Let's let those leases get going full blast. We'll go top leese and take all the money away from somebody else and put all the money and effort into producing. That could happen in this circumstance as well. Again, Your Honors, there really is not a lot of law in this matter. All the law relevant has been decided by both parties. I believe the production records, Your Honors, would show that 2001-2002, but minimally it was down to 2003, was produced by Mrs. Smith. We ask the court to give deference to Judge Todd, who heard all this, who made what we believe was the correct ruling, and allow these matters to stand and see if matters can be closed down. On your last point, your contention, the standard of review is against a manifest way to the evidence? That's what I cited in the brief. That's what the, I believe, the last, I'm sorry, before I misspoke, which case that was. That's okay. If you think it's in there, we can look. I did have that in my brief. I'm sorry, I can't. You've got it in your conclusion. You may have it in your brief, but there isn't a case cited in the conclusion. It could be in here, and I just missed it. I'm sorry, it's Patowski v. Oslaugher. What page? 128-11. What page of the brief? I'm sorry, page 6. Okay, thanks. First paragraph. Thank you, counsel. Thank you. Any rebuttal? Sir? What do you consider the standard of review in this case? Do you agree that it's a manifest way to the evidence, or do you think it's a different standard? I think that's a good question. I couldn't find it in your brief. That's why I thought it was a good question. We believe that the 2009 order entered by the trial court was entered in error as a matter of the law. Do you think there's a de novo review standard? Yes. Thank you. But you don't have any case citation as to the standard of review in this case? But that's fine. We can look at this and see if it applies or not. Sorry, go ahead. We believe that Smith is addressing the wrong issues on this appeal. The issues of to whom and in what proportions the sale proceeds of the oil and gas from this game lease should be distributed was never before the trial court. There was never any evidence presented in the trial court to support that proposition. Reimer's post-trial motion also did not say Reimer should get the money. There is no evidence to support that. There is no authority offered by Smith, no legal authority in support of her position. The legal authorities that are cited are not pertinent to the issues on appeal. For example, the cite from the Oil and Gas Act does not apply to this case. In Smith's post-trial motion, she raised for the first time new theories of recovery, again, that were not a part of the original case. A theory of quantum heroin, a theory of unjust enrichment. There was never any evidence heard that would be sufficient for the court to make a ruling on either of those theories. Council made the, I call it the gotcha argument, but there never was any gotcha. Nobody was hiding in the bushes to take advantage of somebody else. The reference to ramping up production and going full steam never happened. That's really why the 2006 judgment was entered as it was. Smith contends that she is entitled to the suspense funds because she owns all of the working interest in the lease. But that argument ignores the fact that she owns none of the underlying mineral interests. And once the lease was extinguished, the working interest is likewise extinguished by definition. So in conclusion, Reimer respectfully prays that the judgment be reversed and ramped up. Thank you, gentlemen, for your arguments and briefs today. We'll take them under our advisement and get back to recess for 15 minutes.